IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CHARLES E. MOLLOHAN,

Plaintiff,

v.                                          Civil Action No. 1:08-CV-180

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.      Background

Plaintiff, Charles E. Mollohan (Claimant), filed a Complaint on September 25, 2008

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

February 2, 2009.[2]  Claimant filed his Motion for Judgment on the Pleadings on March 11,

2009.[3]  Commissioner filed his Motion for Summary Judgment on April 7, 2009.[4]

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Judgment on the Pleadings.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 16.

[4] Docket No. 17.

1

2.     Defendant's Brief in Support of Motion for Summary Judgment.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ's decision to deny Claimant Social Security benefits was supported by substantial evidence and was based on a properly posed hypothetical question.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on April 7, 2005, alleging disability since September 10, 2003. (Tr. 18, 332). The claim was denied initially on August 19, 2005, and upon reconsideration on February 24, 2006. (Tr. 305-13). Claimant filed a written request for a hearing on March 27, 2006 (Tr. 46). Claimant's request was granted and a hearing was held on July 26, 2007. (Tr. 46, 48-88).

The ALJ issued an unfavorable decision on September 12, 2006. (Tr. 16-26). The ALJ determined Claimant was not disabled under the Act because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966). (Tr. 22-24). On October 16, 2006, Claimant filed a request for review of that

determination. (Tr. 14). The request for review was denied by the Appeals Council on July 29, 2008. (Tr. 8-11). Therefore, on July 29, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B. <u>Personal History</u>

Claimant was born on August 25, 1970, and was thirty-three (33) years old as of the onset date of his alleged disability and thirty-six (36) as of the date of the ALJ's decision. (Tr. 54). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant graduated from high school in special education and worked as a "mechanic" from 1994 to 2004. (Tr. 57, 337, 366, 384).

C. <u>Medical History</u>

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Marietta Memorial Hospital, Michael Tatro, M.D., 9/5/03 (Tr. 408-410)**
Chief Complaint: dental pain
Review of Systems: no fever, chills, nausea, or vomiting. No chest pain, abdominal pain, or shortness of breath. No neurological deficits.
Disposition: instructed patient on a diet; monitor glucose; placed on Vicodin 1-2
Impression: Gum pain secondary to dental extractions; insulin-dependent diabetes

**Braxton County Memorial Hospital, Arturo Sabio, M.D., 10/21/04 (Tr. 411-14)**
Chief Complaint: high sugar; recently moved to area, and out of insulin
Primary Diagnosis: uncontrolled DM1/ ketotic; pseudohyponatremia
Secondary Diagnosis: hyperosmolar syndrome
Modifying Factors: not taking his medications

Physical Exam: normal

**Braxton County Memorial Hospital Discharge Summary, Arturo Sabio, M.D., 12/16/04 - 12/19/04 (Tr. 415-17)**
Provisional Diagnosis: Diabetes Mellitus Type I untreated and uncontrolled, intractable nausea and vomiting due to gastroparesis, gastroenteritis, proteinuria
Final Diagnosis: Diabetes Mellitus Type I, intractable nausea and vomiting, gastroparesis, gastroenteritis, proteinuria

**Braxton County Memorial Hospital History and Physical Examination Record, Arturo Sabio, M.D., 12/17/04 (Tr. 418-21)**
Chief Complaint: intractable nausea and vomiting
History: ran out of Lantus one month prior to this admission; was trying to use regular insulin alone because that was all that he had. He has never been followed up in the office.
Review of Systems: patient denied fever, aches, or pains.
Physical Exam: well developed, well nourished, alert and oriented

**Eye Examination, Amos W. Wilkinson, M.D., 6/27/05 (Tr. 424)**
Allegations: diabetes, deaf in one ear, and poor vision in one eye
Patient's History: states he has had poor vision since birth. Can see shapes and shadows. Over last 8 years, vision has fluctuated. Pain over past week and a half.
Diagnosis: amblyopia; diabetes uncontrolled

**Physical Residual Functional Capacity Assessment, Sheila Heston, 8/4/05 (Tr. 425-32)**
Exertional Limitations
• occasionally lift: 50 pounds
• frequently lift: 25 pounds
• stand and/or walk with normal breaks for a total of 6 hours in an 8-hour workday
• sit with normal breaks for a total of about 6 hours in an 8-hour workday
• push and/or pull (including operation of hand and/or foot controls) unlimited
Postural Limitations
• climbing: occasionally
• balancing: never
• stooping: frequently
• kneeling: frequently
• crouching: frequently
• crawling: frequently
Manipulative Limitations
• reaching all directions: unlimited
• handling: unlimited
• fingering: unlimited
• feeling: unlimited
• note: claimant indicates difficulty using hands which is affected by blood sugar levels; medical findings indicate no neuro deficits

<u>Visual Limitations</u>
- near acuity: unlimited
- far acuity: unlimited
- depth perception: limited
- accommodation: unlimited
- color vision: unlimited
- field of vision: unlimited

<u>Communicative Limitations</u>
- hearing: unlimited
- speaking: unlimited
- note: RC to claimant dated 5/26/05 indicates Claimant is able to hear phone conversation adequately and he indicated that he does not use hearing aids or any amplification device on the phone

<u>Environmental Limitations</u>
- extreme cold: unlimited
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid even moderate exposure

<u>Symptoms</u>
- "Medical and non-medical evidence partially credible. Supported by blindness in OS, impaired vision in OD, normal VF, hx of hosp due to uncontrolled DM, neg neuro deficits, neg edema, & neg leg ulcers. Not fully consistent with questionnaires which indicate claimant is able to care for self independently, although adl's are restricted due to fluctuating blood sugars; complaint of intermittent to constant pain which is relieved by time, rest, & meds; partial relief from meds without side effects. Claimant indicated on his questionnaires that he experiences pain in his joints, stomach, & head; however, none of these were listed as allegations in his application. His 12/04 admission to the hospital indicates no hx of back or joint pain. His medical records indicate stomach problems. Claimant indicated during a phone conversation that he does not use hearing aids or use amplification devices on the phone. He is able to hear phone conversation adequately. FRC reduced to medium due to complaint of constant to intermittent pain, & hx of uncontrolled diabetes which affects his pain, & use of otc meds with partial relief."

**Psychiatric Review Technique, Frank Roman, 8/10/05 (Tr. 433-46)**

<u>Medical Summary</u>
Medical Disposition: impairments not severe
Categories Upon Which the Medical Disposition is Based: 12.02 Organic Mental Disorders; 12.04 Affective Disorders; 12.06 Anxiety-Related Disorders
<u>12.02</u>: BIF
<u>12.04</u>: depression - mild - secondary to physical

<u>12.06</u>: anxiety - mild
<u>Rating of Functional Limitations</u>
- restriction of activities of daily living: mild degree of limitation
- difficulties in maintaining social functioning: mild degree of limitation
- difficulties in maintaining concentration, persistence, or pace: mild degree of limitation
- episodes of decompensation, each of extended duration: none

<u>Notes</u>: medical and non-medical evidence credible. Supported by hx of spec educ training, no allegation of mental impairment, hx of alcohol abuse which is in remission, low WRAT scores, and BIF scores. Consistent with questionnaires which indicate Claimant is able to do adl's independently, except for needing reminded to take meds. Claimant indicates that difficulty with mental function is affected by blood sugar level.

**DDS Psychological Evaluation, John J. Kampsnider, Ph.D., 1/19/06 (Tr. 447-50)**
<u>Chief Complaint</u>: applied for benefits because cannot keep a job - blames it on blood sugar. When questioned as to why he was sent to a psychologist, he noted, "I got no clue, but I think when I was a kid I wasn't too intelligent and I was LD at school."
<u>Presenting Mental Health Symptoms</u>: ongoing anxiety relating to poor health and lack of income and inability to get a job. Chronic history of alcohol abuse.
<u>Mental Treatment History</u>: Claimant denies mental health intervention other than brief attendance at AA and special education classes.
<u>Medical History</u>: daily headaches "when my sugar is too high." Deaf in left ear and blind in left eye. Diabetes, Type I. Reports numbness and pain in hands and feet. Takes daily injections of insulin to control diabetes.
<u>Daily Activities</u>: eats breakfast if sugar level allows; spends morning hours bringing in wood, starting fire, and watching television or a movie. Spends afternoon hours watching television and visiting with friends. Does household chores such as dishes, beds, laundry. Prepares supper for himself when his blood sugar permits. Spends evening hours visiting friends or watching television. Travels to town approximately one to two times per week. Limited family contact with no current visitation with his children (his wife has a restraining order). Does not attend church or any other social organizations.
<u>Mental Status Examination</u>: thought process: organized, relevant, and logically connected. Thought content: revealed no evidence of delusions or obsessive-compulsive thought patterns. Perception: no evidence of hallucinations or illusions. Concentration: within normal limits based upon Claimant's calculation of Serial 3's backward containing one error.
<u>Prognosis</u>: fair for mental health symptoms

**West Virginia Disability Determination Service, History and Physical Examination, Arturo Sabio, 1/19/06 (Tr. 451-55)**
<u>Chief Complaints</u>: Diabetes mellitus, deafness in the left ear, anxiety attacks, poor vision in left eye
<u>Review of Systems</u>: Gastrointestinal: has occasional heartburn. Neurological: denied fainting spells, dizziness, or convulsions.
<u>Physical Examination</u>: well-developed, well-nourished, alert and oriented to time, place, and person; able to hear and understand conversational voices spoken at normal volume levels.

Visual fields are normal by gross confrontation testing.

<u>Diagnostic Impression</u>: Diabetes Mellitus Type 1, uncontrolled; deafness in left ear, probably congenital; amblyopia of left eye with visual acuity of counting fingers at four feet

**<u>Physical Residual Functional Capacity Assessment, Atiya Lateef, 2/7/06 (Tr. 456-63)</u>**

<u>Exertional Limitations</u>: none

<u>Postural Limitations</u>:
• 	climbing ramp/stairs: frequently
• 	climbing ladder/rope/scaffolds: never
• 	balancing: frequently
• 	stooping: frequently
• 	kneeling: frequently
• 	crouching: frequently
• 	crawling: frequently

<u>Manipulative Limitations</u>: none

<u>Visual Limitations</u>:
• 	depth perception: limited

<u>Communicative Limitations</u>: none

<u>Environmental Limitations</u>:
• 	extreme cold: avoid concentrated exposure
• 	extreme heat: avoid concentrated exposure
• 	wetness: unlimited
• 	humidity: unlimited
• 	noise: unlimited
• 	vibration: unlimited
• 	fumes, odors, dusts, gases, poor ventilation: unlimited
• 	hazards: avoid all exposure

<u>Symptoms</u>: mer support partial credibility

<u>Notes</u>: did not complain of headaches at exam. Neuro exam normal, including sensation. Able to hear conversation an n1 levels. Visits with friends, shops monthly, needs reminder to take meds, prepares simple foods, does not know how to cook a meal, not able to do any household chores because of sugar levels. Brings in wood, starts fire, does dishes, beds, laundry etc. sugar level affects vision, concentration at certain times, can follow instructions well.

**<u>Psychiatric Review Technique, Joseph Shaver, 2/22/06 (Tr. 464-77)</u>**

<u>Medical Summary</u>:
• 	Medical Disposition: impairment(s) not severe
• 	Categories: 12.06 anxiety-related disorders

<u>12.06</u>: adjustment D/O with anxiety

<u>Rating of Functional Limitations</u>
• 	restriction of activities of daily living: mild degree of limitation
• 	difficulties in maintaining social functioning: none
• 	difficulties in maintaining concentration, persistence, or pace: none
• 	episodes of decompensation, each of extended duration: none

<u>Notes</u>: Claimant appears to be generally credible regarding his reported mental functioning.  Any restrictions in Claimant's ADL's seem to be more a function of his physical conditions.  It is believed that Claimant possesses the mental capacity to maintain gainful employment on a sustained basis.

D.    <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on March 21, 2007.  The following portions of

the testimony are relevant to the disposition of the case:

Q    What is your date of birth?

A    8/25/70

Q    How old are you today?

A    I'm 35.

Q    You'll be 36 next month?

A    Yes, sir.

Q    How tall are you?

A    5'11".

Q    And, how much do you weigh?

A    I'm 150.

Q    Do you consider that normal?

A    Yeah, my doctor tells me I'm still a little underweight, yet.

                    *              *              *

Q    Did you have any problem riding in a car for two hours?

A    A little bit of difficulty because I, my sugar makes me have to use the bathroom

quite often.

Q    Did you have to stop coming up?

8

A       Yes, sir.

Q       How many times?

A       Twice.

Q       Was that because of your condition or just a rest stop?

A       No, I had to use the restroom each time and get something to drink.  My sugar makes me very thirsty.

Q       Okay.  Did you graduate from high school?

A       Yes, sir.

Q       Can you read?

A       Yes, sir.

Q       Can you write?

A       Yes, sir.

Q       Can you count money and make change?

A       Yes, sir.

Q       Any other training after you finished school?

A       No, sir.

Q       Where did you learn to be a mechanic?

A       Just hands on experience.  My father owned a trucking company and we logged and stuff like that where I was around it quite a bit.

                              *              *              *

Q       All right.  You indicated that you worked full-time up until '03, 2003?

A       Yes, sir.

Q       And, then you worked a little bit into '04?

A       Yes, sir.

Q       And, you said your disability began September 10, 2003, is that the day you last worked?

A       Yes, sir.

Q       And, then you tried to go back?

A       I tried, yes, sir.

Q       When did you go back?

A       It was in '04, I believe, for Arcade Motors.  I tried to work there and then I just couldn't keep my blood sugar, it was too unstable and they was a little insecure in my work you know what I mean, stuff like that, that I can't quite see like I used to and my, I've lost the feeling in my hands to where if you can't see what you're, what bolt you're turning, you know what I mean, it's kind of hard to direct your hands to do, you know, what it's supposed to.  And, then my knees, it's hard on my legs and stuff to stand for long periods of time, because my legs go, go pretty numb.

Q       All right.  The work you've done in the past, have you always been a mechanic?

A       Yes, sir.

Q       Can you tell me about when you started being a mechanic full-time, what year?

A       Not really.  It was in '91 or '92, I would say.

Q       And, you worked up until '03?

A       Yes, sir.

Q       And, then you tried to go back and work a little bit in '04?

A       Yes, sir.

Q       You couldn't do it?

A       Yes, sir.

Q       Is that what you're telling me?

A       Yes, sir.

Q       You quit because of your condition?

A       Yes, sir.

Q       Okay.  Are you working now for cash?

A       No, sir.

Q       Are you, are you doing any volunteer work or helping out on the side?

A       No, sir.  No, sir.  I just try to, you know, maintain that little place where my mother used to live, and keep it up a little bit, about all I've been doing.

Q       You mean, that's a home?

A       Yeah.  My mother's home.

Q       All right.

A       But, she's deceased right now.

Q       All right.  And, your work as a mechanic, can you give me some idea of what, what kind of work you did?

A       I worked on anywhere's from auto, regular automobiles to bull dozers to dump trucks, drive for dump trucks, heavy equipment.  I've worked on quite bit of different things.  I just never did work with any ATVs or any motorcycles or nothing like that.  All I've ever worked with is auto, you know, something that a company had that they needed to use.

Q      And, what was the heaviest part of that work for you?  What did you find in doing the mechanic work the heaviest part of the job was?

A      Heaviest was lifting.

Q      Okay.  What were you lifting?

A      Tires, you know what I mean.  Occasionally, you know what I mean, transmission, or something, you know that's, your motors.

Q      How about parts - -

A      When you get in - -

Q      - - transmissions, did you pull heads and things like that?

A      Yes, sir.  When you got into heavy equipment they quite a bit of the stuff that was heavy.

Q      So, you're telling me that you also changed tires?

A      Yes, sir.

Q      Okay.  Anything else unique about what you did?

A      I welded, I cut, you know what I mean.  I been in it since I was a young child, my dad had it so they was, you know what I mean, I've done, when it comes to working on equipment and cars, stuff like that, I pretty much been there and done done that.

Q      All right.  Now, my review of the record indicates that you were, you've been a diabetic and you give yourself injections?

A      Yes, sir.

Q      And, do you, is it because you can't read, or read the meter or you're not taking control, I mean, how much of the - -

A       It's my body, it's my body weight and my eating habits and I've got to, my teeth is, I had my teeth pulled on September 3rd, that's why it kind of knocked me out of work right then because infection put me in the hospital and my bottom teeth I still ain't got them took out and anytime I get a little infection or something it'll drive my sugar up or down and I'm on like a sliding sale, you know, I, you never can hit it kind of basically right.  It's either up or down, it's my body weight, I ain't got enough weight to my body to stabilize it in one spot.  It'll either jump up or jump down, at any given time.

Q       Now, in your past history the doctors indicated that you had a pretty good drinking history?

A       Yes, sir.

Q       And, when did all that quit?

A       Nine years ago.  April the 8th, nine years ago.  I have not had a drink since, Your Honor.

Q       And, were you a diabetic then?

A       No, sir.

Q       When did it start?

A       Let's see, I quit drinking about approximately a year before, I'd say a year before, a year before I found out I had diabetes, I done quit drinking.  Because they said if I wouldn't have quit drinking, I would never knowed I had diabetes.

Q       How did you come to realize that you were a diabetic?

A       My brother's a Type, was a Type II at the time - -

Q       Uh-huh.

A     - - and I knew some of his symptoms and as I was trying to work in Marietta, I was getting the same symptoms, getting a lot to drink, going to the bathroom a lot, and stuff. And, I felt like I had real bad flu, so two weeks or a week and a half later I finally went, my wife had me to go to the hospital and I went to the hospital and they found out I had blood, diabetes and it was 1300.

Q     Does the diabetes affect your upper or lower arms?

A     Yes, sir.

Q     Tell me how?

A     It, they, they go numb, quite a bit.

Q     Your arms, your legs or both?

A     Yeah, both.  From the elbows down on my arms, basically, and my wrists, my hands.  My legs they stay numb a lot, from my knees down.

Q     Are you, are you not able to walk?

A     Yeah, I can walk, but after a period of time they're liable to give out on me, or they just get so darn achy that my knees, you know what I mean, stuff like that, that I just can't stand it, I got to sit down.

Q     And, you, you tell me you can't use your arms or anything?

A     Well, I can at periods of time, you know, it's just like my mechanic work, it's, it's different type, you know what I mean, like I said a lot of times I can't see where my hands are at - -

Q     Uh-huh.

A     - - you know what I mean.  But, if I can see them, I can control them, if I can't see

them, I can fight with the bolt hole and a bolt for two hours and never get it in the hole, because I can't feel where the hole's at.

Q        Did the doctor ever tell you you had acidosis?  You know what that is?

A        I believe, yeah.

Q        What is it?

A        It's, if it's what they're talking about in my lower intestines.  Gives me real bad cramps and a sensation, I've had two or three different troubles like that with my digestive system.

Q        How often?

A        At least, once or twice a year.

Q        And, does the blood work show it, in your opinion - -

A        Yes, sir.

Q        - - and, the doctor said your blood work was showing?

A        I just go off of their opinion - -

Q        Okay.

A        - - I ain't, I ain't a doctor, I don't, you know what I mean, I just trust to help me, you know, when I get in that situation.

Q        Now, you've had problems with your eye?

A        Uh-huh.  I'm deaf in one ear - -

Q        Deaf in your left ear and problem with your left eye?

A        Yeah.

Q        The eye and ear on the same side?

A    Yes, sir.

Q    Is the eye related to your diabetes?

A    No, sir.  I had that as a child, I was born that way.

Q    Are you having any problems with your vision because of your diabetes?

A    Yes, sir.

Q    What, what, what's happening?

A    I see hardly nothing anymore.  It's not that I'm blind, it's just I can't see to read a lot of times and - -

Q    Do you wear glasses?

A    I've got the, I ain't got no insurance, well I hadn't had no insurance to get me any glasses.  I had an old set of reading glasses my sister gives me that I can put on occasionally, you know what I mean, and use.

Q    And, do you have a hearing aid?  Do you have any hearing in the ear where you're deaf?

A    No, sir.

Q    None?

A    No, sir.

Q    But, you don't wear any hearing aid?

A    No, sir.  It's been since I was birth and I just never really had the money to buy one.

Q    Are you not able to hear my questions?

A    Yes, sir, I can hear your questions.

Q    Okay.  And, it, it doesn't appear that it's affected your ability to speak?  I mean - -

A    No, sir.

Q    - - you can hear enough that you have a - -

A    Yes, sir.

Q    - - good conversational - -

A    Yes, sir.

                    *            *            *

Q    Well, what is it about your condition that keeps you from working?

A    It's just my ability to be able to do my job with my hands and my legs and stuff the way they are.  And, my lower back.  And, my eye sight.  I can't see as clear as I used to, to be able to hook stuff up and unhook it and do a good proper job of it and if I don't do a good proper job of it, they're not going to get no more customers in and then they're going to lose business and then when they find out I'm Type I diabetic it makes a lot of people nervous of me working on their automobiles.

Q    Okay.

A    And, I've never really been trained to do any other type work.

Q    Okay.   No surgeries, right?

A    No, sir.  Yes, take that back, I had one cyst removed on my neck, that's as far as surgeries I've ever had.

Q    But, I mean nothing related to - -

A    No, sir.

Q    Okay.  And, does it, you say you have some numbness, but do you have pain?

A    Yes, sir.

Q    Where's your pain?

A    In all my joints and in my lower back, and I get quite a few headaches, frequently. Because, if my blood sugar goes either way, sometimes it gives me a migraine headache.

Q    Okay.  What aggravates it?  What makes it worse?

A    What the headaches?

Q    Well, the back aches, the joints, the headaches - -

A    Just sugar out of control.

Q    - - the sugar - -

A    The more out of sugar, the more out of control it is, the worse the pains and aches get.

Q    All right.

A    It's like I got dry joints.

Q    Okay.  Who do you consider your doctor to be when you go?

A    Mrs. Wilson, over at Roane County.  I really like her and she's been doing me real good here lately.

Q    And, you've been there two or three times this year?

A    Yeah.  I been here approximately four times, I believe.  I ain't really for sure, but I'm supposed to go back August the 2nd and see her again.

Q    All right.

A    I was seeing her every once a month and then she let me go for three months because I didn't have no insurance and she didn't want to see my bill get out of control.

Q       Now, other than the insulin and everything, you take any thing else?

A       Yes, sir.  I take a thyroid pill, which I ain't so sure what is, I mean, I'm sure that got it wrote down.  And, then I take a Vicodin for my pain.

Q       Do you have a problem with your nerves or your mental condition?

A       A little bit.

Q       What, what is it?

A       Well, if you're talking about mental or whatever, like that, I just went through a separation with my wife and my children and everything and she will not let me ability to see them and stuff and it gives me a lot of heart ache and because I've always took care of them, I've always tried for them.

Q       Are you in any kind of counseling or anything?

A       No, sir.  I, I ain't had a chance, you know what I mean, or don't know how to get into it, to be honest with you, I would if I had a chance.

Q       Have you seen a psychologist?

A       No, sir.  Because, I ain't had no, no funds to be able to pay for nothing like that.

Q       All right.  And, you're not taking any medication for your nerves?

A       No, sir.  Because, I have not got a chance to see anybody to, to take care of that for me.

Q       All right.  Walking is limited to how far?

A       It just gives, sometimes I can walk very little and sometimes I can walk a good little bit, it just depends on my sugar level and what it has been.  And, it don't go only on that day, it could be back from like three days, four days ahead of time, if it's been out of shape for

three or four days to five days, I can't hardly do nothing at all.  But, if I've kept my sugar under control for five, six, seven days, you know what I mean?

Q      Uh-huh.

A      Then I'm a little better than I'm, you know, it varies.  That goes for my eye sight, too.  Sometimes it's a lot worse and then sometimes it's a lot better.  That's why they can't really prescribe me no really glasses, you know what mean, to take care of it, because it changes so much.

Q      Standing is limited to how long?

A      For a half hour, 45 minutes, at the most.

Q      Any problems in bending over, stooping or squatting?

A      Yeah, my, my lower back hurts quite a bit from bending over, you know what I mean, working with that stuff, and pulling and lugging at it so much.

Q      Right-handed or left-handed?

A      Right-handed.

Q      Can you make a fist with both your hands?  Any problem doing that?

A      They ache a little bit, but - -

Q      Okay.

A      - - ain't nothing major.

Q      Do, do you have feeling in your hands today?

A      No, sir.

Q      You don't have any feeling at all?

A      Very little.

Q       If you laid your hands on a hot stove - -

A       On a hot plate it would burn it.

Q       - - would you pull it off?

A       Yes, it would burn.

Q       Okay.

                    *               *               *

Q       How much can you lift today?

A       I don't know, never really tried.

Q       What do you carry around on a routine basis?  You said you build firewood, you heat with wood?

A       Yeah.

Q       How many logs can you carry at one time?

A       Four, five, six.

Q       How much does that weigh?

A       30, 40 pounds, probably.

Q       You can carry that much?

A       20, 30 pounds, yeah.

Q       Sitting, like you are now?

A       Huh?

Q       Sitting, how long can you sit?

A       Good period of time.  Never really paid any attention to how long I could sit or anything like that to be honest with you.

Q      Okay.  Do you have problems with your memory?

A      A little.

Q      Which is easier for you, remembering things long ago, or yesterday?

A      It's harder for me to remember things long ago.  It just depends on what I'm trying to remember, really.

Q      Do you like to watch TV?

A      Not really.

Q      Do you, are you able to understand the programs?

A      Yes, sir.

                    *                    *                    *

Q      Do you have breathing problems?

A      Yes, sir.

Q      What makes it worse?

A      My blood sugar.  My blood sugar goes high, it gets severely hard for me to breathe.

Q      Do you smoke?

A      Yes, sir.

Q      How many years have you smoked?

A      I've smoked for 15 years, I'd say.

Q      How much you smoke a day?

A      A pack a day.  Less than a pack a day.

Q      Okay.

A       I've cut back quite a bit.

                        *                *                *

Q       Uh-huh.  And, you, you have any trouble getting your diabetes medication?

A       No, sir.

Q       How do you get it, go to the grocery store or the pharmacy?

A       My nieces, a lot of time they, they pick it up for me.

Q       And, even though you didn't have insurance they bought it for you?

A       Yes, sir.

Q       Okay.  And, you take it regularly?

A       Yes, sir.

Q       You inject yourself?

A       Yes, sir.

Q       Where do you give yourself the injection?

A       Stomach.

Q       Stomach.

A       I've got my medicine, matter of fact, in the car as we speak.  I don't go nowhere without it.

Q       How do, how do you test your blood sugar?

A       My blood machine, or my glucose machine.  And, they've been providing the strips for it, too.

Q       Okay.

A       Now, my doctor over in Spencer, Roane County, had gave me about 12 bottles of

medicine, here recently, of the one kind, but I take two different type. But, they helped me in getting 12 bottle of it.

Q    Okay.

*         *         *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q    I noticed in the record that they talked, that you have gastrointestinal problems, they say gastroparesis, and then you said that they had said something to you about your weight wasn't what it should be.

A    Yeah.

Q    Can you tell me about that?

A    They would like for me to weigh 160, because my body, my bone size and everything. I'm going off what she said. She said I need to gain a little bit of weight, and definitely don't lose none.

Q    What kinds of problems do you have?

A    Severe cramping when I get that and I can't eat, which causes my blood sugar to go up or down, you know, and it just messes with it. When they pulled my upper teeth, it's just like I got it right shortly after that because I got a lot of severe infection down in my digestive system.

Q    Okay.

*         *         *

Q    '03. You still have, you still have problems with your teeth?

A    Yes, sir. I still got my bottom ones.

24

Q        Are they infected or - -

A        Yes, sir.

Q        - - cavities?

A        They're broke off and everything else.  I intend on getting, trying to get them

taken  care of, now that I got a medical card.

Q        All right.

                        *                *                *

Q        Have you reviewed the vocational and other exhibits of record?

A        Yes, Your Honor.

Q        Is there any additional information you need before you can classify his past

work?

A        No, Your Honor.

Q        All right.  Would you classify the exertional and skill level of the claimant's past

relevant work?

A        Work as a mechanic.  Exertional level is medium, skill level is skilled.

Q        He's a younger individual between the ages of 33 and 36, he has a high school

education and he has the history of being a mechanic that you described.  Is there any skills that,

mechanic skills transfer to any other jobs, any other - -

A        It's pretty unique, Your Honor, to that industry, there's not really any skills that

would be transferable.

Q        All right.  They hypotheticals of the State agency, there are several different

hypotheticals.  I'll give you, the one, the first one that I noted, is in the record at exhibit B6F.

Keep in mind, he's a younger individual, for terms of the rules. The State agency indicated that for such an individual there would be a limitation to medium work, 50 pounds occasionally, 25 pounds frequently. Standing and walking 6 out of 8 hours, with normal breaks. Sitting 6 out of 8 hours with normal breaks. Occasionally climb ramps and stairs. Never climb any ladders, ropes or scaffolds. Limited in depth perception to the vision. The left eye, he's considered blind. Some left ear deafness, but I don't detect any issues with respect to inability to hear conversational tone. And, should avoid even moderate exposure to the hazards of moving plant machinery and unprotected heights. With that hypothetical could he perform the mechanic work?

A      Well, it says the hypothetical includes avoid moving machinery - -

Q      Yes.

A      - - so there would be moving machinery in any type garage, cars going in and out, trucks, whatever.

Q      So you don't consider the past work to be available?

A      No, I do not, Your Honor.

Q      All right. All right. All right. On the second hypothetical, which is in the record at exhibit B10F, consider no physical exertional limitations. However, consider the posturally never climb any ladders, ropes, or scaffolds. The limit, limitation on the depth perception of vision, based on an amblyopia of the left eye to, I believe I've seen counting fingers at four feet. Right eye 20/60. Environmentally avoid concentrated exposure to the temperature extremes of heat and cold and again all hazards of moving machinery and unprotected heights. Now, without a limitation on an actual exertional limit, could you identify jobs that such an individual could

perform with that hypothetical and the exertional levels of work that would be available to such an individual?

A        Under the heavy exertional level, Your Honor, landscape laborer, 894,200 nationally, 9,800 regionally.

Q        The region is what?

A        The region is all of West Virginia - -

Q        All right.

A        - - Western Maryland, Western Pennsylvania and Eastern Ohio.

Q        All right.  Continue, sorry I didn't, I didn't write that down when you said it.

A        Because, we're, the hypothetical includes avoid temperature extremes and never having the ability to climb, I'd reduce those number in half, Your Honor.

Q        The landscaper?

A        Yes.  Under the medium exertional level, a hand packer, 750,000 nationally, 6,700 regionally - -

ATTY          I didn't get the region.

VE                - - 6,700.  And, because in some of those different types of plants there is moving plant machinery, I'd reduce those numbers in half, Your Honor.  A stock clerk, 650,000 nationally, 8,000 regionally.  And, because the hypothetical includes never climbing and moving machinery, I'd reduce those numbers in half, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q        Mr. Ganoe, did you say that was a light job?

A        Medium.

27

Q        Medium, okay.

A        Under the light exertional level, Your Honor, a mail clerk, 202,000 nationally,
2,300 regionally.  A ticket taker, 190,000 nationally, 1,700 regionally.  Again, those are a
sampling, Your Honor.

Q        Okay.

A        Sedentary, under the sedentary level, an addresser/stuffer position, 240,000
nationally, 2,000 regionally.  A bench worker, 103,000 nationally, 2,100 regionally.  Again,
those are a sampling, Your Honor.

Q        Okay.  All those jobs that you've described, would they be considered unskilled
work?

A        Yes, they would, Your Honor.

Q        Okay.  Now, the, assume that the claimant's testimony is completely credible, and
it's supported by his medical records, so as to preclude even the sedentary exertional level of
work, by that I mean, not even able to lift 10 pounds occasionally or 5 pounds or less frequently.
The ability to sit is less than 6.  And, because of his pain and discomfort, numbness, whatever,
he's not able to even do simple, unskilled 1, 2 step type tasks.  If that be the case, would there be
any jobs such an individual could perform?

A        No, there would not be, Your Honor.

Q        And, was all of your testimony, including the reductions in the numbers of jobs
because of the hypotheticals that were given regarding those environmental restrictions,
consistent with the Dictionary of Occupational Titles?

A        Well, some of the testimony is based upon my experience in placing individuals

in positions - -

Q      Okay.

A      - - such as avoiding plant machinery and things like that.

Q      All right.

*        *        *

E.      <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- lost his license but is still able to drive (Tr. 56, 361)

- can hold a fork and spoon (Tr. 71)

- can button a shirt (Tr. 71)

- can carry up to six firewood logs at once (Tr. 71)

- does not like to watch television but can understand the programming (Tr. 72, 362)

- does not like to be in crowds of over 10 people (Tr. 72)

- has smoked one pack of cigarettes per day for the last fifteen years (Tr. 73)

- has little trouble sleeping (Tr. 73)

- can take care of himself (Tr. 73, 359)

- cooks for himself occasionally (Tr. 74, 360)

- walks his dog (Tr. 74)

- takes care of his trailer and does routine maintenance; has help cleaning (Tr. 74, 77, 360)

- listens to the radio (Tr. 75)

- plays cards (Tr. 75)

- can no longer do mechanic work (Tr. 75)

- can no longer hunt (Tr. 76)

- does not do his own laundry (Tr. 77)

- has family and friends visit daily (Tr. 77-78)

- goes outside everyday (Tr. 361)

- goes to the grocery store with the help of family/friends (Tr. 361)

- is able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 361)

- needs reminders to go to appointments (Tr. 362)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant DIB and SSI is not supported by substantial evidence because it fails to properly credit the Claimant and his treating physician's statements and opinions.  Claimant also argues that the decision to deny benefits is based upon an incomplete hypothetical question posed to the VE.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the Claimant failed to prove that he is disabled as defined by the Act.  Commissioner argues that the ALJ correctly found the Claimant "not entirely credible," properly rejected physician's opinions, and formulated a residual functional capacity assessment that fully accommodated the Claimant's impairments.  Claimant also contends that the ALJ posed a complete hypothetical question to the VE and correctly considered Claimant's failure to take his

medication as part of the credibility analysis.

B.    Discussion

I.  The ALJ's Decision was Supported by Substantial Evidence.

Claimant argues that the ALJ's decision is not supported by substantial evidence because it fails to properly credit Claimant and his treating physician's statements and opinions, specifically alleging that the ALJ violated Social Security Ruling 96-7, 20 C.F.R. § 404.1529, and 20 C.F.R. § 404.1527.  Commissioner contends that the ALJ followed the two-step analysis outlined in the regulations and correctly discredited Claimant's testimony.  Commissioner also contends that the ALJ properly considered and gave appropriate weight to each physician.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discredited Claimant's subjective complaints.  While it is true that under the

Regulations the ALJ must consider certain factors when evaluating credibility, the Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id</u>. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment. <u>Id</u>. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. <u>Id</u>. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. <u>Id</u>.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (7th Cir. 1984) (citing <u>Tyler v. Weinberger</u>, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." <u>See</u> <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) (citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990)).

The ALJ properly followed the two-step analysis outlined in <u>Craig</u>. First, the ALJ considered whether the Claimant had an impairment stating "that the Claimant's medically

determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. 23). The ALJ then weighed Claimant's testimony in considering all the evidence and concluded that the "Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 23). In coming to this conclusion, the ALJ found Claimant to be inconsistent with his treatment for his diabetes citing and relying upon the medical records. (Tr. 23). The ALJ cites a January 19, 2006, visit to Dr. Sabio when Claimant was using his insulin and monitoring his blood sugars four times per day. "There was no evidence of numbness or other signs of diabetic neuropathy, diabetic ulcers, diabetic retinopathy or acidosis, and the claimant reported no problems with migraine headaches or shortness of breath, which is not consistent with the claimant's complaints." (Tr. 23). Further the ALJ stated that "Dr. Sabio's report shows that when the claimant is compliant with treatment, his diabetes is controllable and would not cause the debilitating symptoms to which he is testified, which appears to be significantly exaggerated." (Tr. 23).

Additionally, Claimant argues that the ALJ's decision was not supported by substantial evidence because he failed to accord adequate weight to the opinion of Claimant's physicians. All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans, 734

F.2d at 1015. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater

weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

Claimant argues that the ALJ failed to accord adequate weight to the opinion of Claimant's physicians; however, Claimant neither identifies which physicians were not given appropriate weight nor cites any evidence of such inadequate weight. Nonetheless, the Court's review reveals that the ALJ's decision was supported by substantial evidence and adequately weighed the physicians' opinions. The ALJ relied upon Dr. Sabio's January 19, 2006, report showing that when "Claimant is compliant with his treatment, his diabetes is controllable and would not cause the debilitating symptoms to which he testified, which appears to be significantly exaggerated." (Tr. 23). Additionally, the ALJ cites records on February 24, 2006, March 27, 2006, and May 1, 2006, none of which reported significant work-related limitations. The ALJ does note that in the May 1, 2006 report, Claimant was "only restricted from 'heavy lifting' and no reading, which is essentially medium unskilled work." (Tr. 23). Finally, the ALJ addresses the weight given to medical opinions citing their support by the objective medical evidence of record and the source of the medical opinion. (Tr. 23-24). Because the ALJ gave appropriate weight to the treating physicians, the ALJ had substantial evidence to support a finding of not disabled.

II. The ALJ Properly Posed a Complete Hypothetical Question to the Vocational Expert.

Claimant argues that the ALJ erroneously discredited testimony and evidence of record and, as a result, posed an incomplete hypothetical question to the VE. Specifically, Claimant alleges that the ALJ violated Social Security Ruling 96-8p by failing to consider the effects of

the Claimant's non-exertional impairments on his ability to work and violated Social Security Ruling 82-59 in finding that Claimant was non-compliant with his treatment.  Additionally, Claimant argues that the ALJ's second hypothetical question to the VE was proper, and the ALJ erred by not relying on the VE's answer to the second hypothetical.

The Commissioner counters that the first hypothetical posed to the VE was proper because the record does not support Claimant's contentions of non-exertional impairments.  Commissioner also contends that the ALJ did not violate SSR 82-59 because the ALJ did not identify "failure to follow prescribed treatment" as an issue in this case.  Additionally, Commissioner contends that the ALJ did not err in discrediting the answer to the second hypothetical question because it assumed that Claimant's testimony was entirely credible and medically supported.

### 1. The ALJ Did Not Violate SSR 96-8p.

The issue is whether the hypothetical question properly set forth all the relevant evidence of record concerning Claimant's impairments.  The Fourth Circuit Court of Appeal has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record.  Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003)[5].  The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe.  Id.  Moreover, based on the

---

[5]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

Claimant argues that the ALJ violated Social Security Ruling 96-8p by failing to consider all of the Claimant's non-exertional impairments on his ability to work, specifically his concentration and cognitive limitations, need for frequent restroom breaks, inability to maintain punctuality and timeliness on job tasks, and numbness in his hands and feet.[6] Claimant contends that the "medical record is complete with support for Mr. Mollohan's uncontrolled diabetes and the limitations that condition imposes. Further supporting these limitations is the letter provided by Mr. Mollohan's former employer which describes the difficulties Mr. Mollohan faced when he attempted to return to work."[7]

Social Security Ruling 96-8p does require the ALJ to consider all impairments, severe and non-severe; however, Claimant fails to cite that 96-8p requires that "in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. . . . Likewise, when there is no allegation of a physical or mental limitations or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitations or restriction with respect to that functional capacity." SSR 96-8p. Further, the Ruling plainly states "the adjudicator must . . . make every reasonable effort to ensure that the

_____

[6] Doc. No. 16, P. 7.

[7] Doc. No. 16, P. 7.

file contains sufficient evidence to assess RFC."  Id.

The record contains no medical evidence to support Claimant's contentions that the ALJ should have included concentration and cognitive limitations.  On the contrary, the record shows that despite being diagnosed with a learning disability, Claimant had little to no cognitive limitations.  In his Psychological Evaluation, Dr. Kampsnider found that Claimant's thought process was organized, relevant, and logically connected; Claimant revealed no evidence of delusions, obsessive compulsive thought patterns, or hallucinations; and Claimant's concentration was in normal limits.  (Tr. 447-50).  Similarly, Dr. Shaver found in his Psychiatric Review that any restrictions seem to be more a function of Claimant's physical condition.  (Tr. 464-77).  Additionally, Dr. Shaver believed that Claimant possessed the mental capacity to maintain gainful employment on a sustained basis.  (Tr. 464-77).  Finally, in his Physical Residual Functional Capacity Assessment, Dr. Lateef found that Claimant can follow instructions well.  (Tr. 456-63).  There is simply no medical evidence to suggest that Claimant was limited by cognitive or concentration problems.

The record also contains no medical evidence to support Claimant's contention that the ALJ should have included the need for frequent restroom breaks, the inability to maintain punctuality and timeliness on job tasks, and numbness in his hands and feet.  Claimant cites a letter from Claimant's former employer at Midas to support his contentions; however, the letter was written on December 16, 2002, which is before the September 10, 2003 onset date.  (Tr. 130).  There are no medical records indicating the need for frequent restroom breaks or the inability to remain punctual and timely on job tasks.  The only medical records the Court can identify relating to numbness in hands or feet are the February 2, 2006, examination by Dr. Sabio

and the January 19, 2006, Psychological Evaluation by Dr. Kampsnider. (Tr. 447-51; 451-55). However, neither Dr. Kampsnider nor Dr. Sabio's report diagnose problems resulting from the numbness. Dr. Kampsnider's report indicates in the "Medical History" section that Claimant reports "numbness and pain in my hands and feet." (Tr. 448). Dr. Sabio merely indicates that Claimant "did not have any numbness during the examination, although he does complain of numbness and stinging, which comes and goes in his feet." (Tr. 455).

The ALJ is afforded "great latitude in posing hypothetical questions." Koonce v. Apfel,[8] 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774). The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the Claimant's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also Hammond v. Apfel,[9] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001). The ALJ did not err in excluding the Claimant's numbness complaints. The only supporting evidence before the ALJ regarding Claimant's numbness were documented subjective complaints by Claimant; they were not supported by objective medical evidence. Therefore, there was not substantial evidence to accurately reflect a limitation based on Claimant's subjective complaint of numbness.

2. The ALJ Did Not Violate SSR 82-59.

---

[8] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

[9] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

Claimant argues that the ALJ failed to comply with Social Security Ruling 82-59 in finding that Claimant was non-complaint with his treatment. Commissioner contends that the ALJ did not identify "failure to follow prescribed treatment" as an issue in the case, and therefore, SSR 82-59 does not apply.

Social Security Ruling 82-59 states the policy and describes the criteria necessary for a finding of "failure to follow prescribed treatment" when evaluating disability under Titles II and XVI of the Social Security Act and Implementing Regulations. The policy behind SSR 82-59 is to find individuals, who would otherwise be found to be under a disability, not disabled by virtue of their failure to follow treatment prescribed by a treating source, which the Social Security Administration determines can be expected to restore the individual's ability to work.

Though Claimant accurately identifies the four conditions that must be present before finding a failure to follow prescribed treatment, Claimant misunderstands the ALJ's reference to Claimant's failure to follow prescribed treatment. The ALJ does not reference Claimant's inconsistency with his treatment as grounds to deny benefits but to discredit the intensity, persistence and limiting effects of Claimant's symptoms. The ALJ recounts Claimant's testimony concerning his experience with "headaches, pain and numbness in his hands, arms, and legs, and stomach cramping, which limits his ability to stand and/or walk for very long." (Tr. 23). The ALJ then continues stating that

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(Tr. 23). To discredit Claimant's statements concerning the alleged symptoms, the ALJ cites various doctors' reports that portray Claimant's inconsistencies in his treatment. In no way does

the ALJ reference SSR 82-59 or the failure to follow prescribed treatment.

### 3. The ALJ Did Not Err by Discrediting the Vocational Expert's Answer to the Second Hypothetical Question.

Claimant suggests that the ALJ incorrectly discredited both Claimant's testimony and the supportive evidence of record and should have relied upon the VE's negative response to the second hypothetical. Commissioner contends that the second hypothetical assumed Claimant's testimony was completely credible and supported by the medical records, and therefore, the ALJ was not obligated to rely upon the VE's response.

As previously stated, hypotheticals posed to the VE need only reflect those impairments supported by the record. Russell, 58 Fed. Appx., at 30; 2003 WL 257494, at 4. The ALJ is afforded great latitude in posing the hypothetical and need only pose those questions based on substantial evidence and accurately reflect the claimant's limitations. Copeland, 861 F.2d, at 540-41; see also Koonce, 1999 WL 7864, at 5; Hammond, 2001 WL 87460, at 4.

Claimant contends that the ALJ improperly rejected the VE's answer to the second hypothetical by discrediting Claimant's testimony and the supportive evidence of record in this case. The Court will forego another complete credibility analysis as it has previously found the ALJ complied with the two-part procedure set forth in Craig and correctly discredited Claimant's subjective allegations. Claimant has failed to show any evidence suggesting that the ALJ's credibility determination was patently wrong. Because Claimant had the burden, the Court cannot reverse the ALJ's credibility determination. Therefore, the ALJ did not err in discrediting Claimant's testimony.

Additionally, the ALJ did not err in discrediting the supportive evidence of record. First, Claimant cites no specific supportive evidence of record, so the Court is unable to determine to which part of the record Claimant is referring. Second, if Claimant were referring to medical records supporting Claimant's credibility and "serious problems with being on time and being able to remain at work for an entire work day as a result of his uncontrolled diabetes mellitus,"[10] the Court has already determined that no medical records exist supporting Claimant's allegations of nonexertional limitations. The only evidence supporting Claimant's allegations of his inability to be on time and remain at work is a letter from a former employer at Midas written prior to Claimant's September 10, 2003 onset date. Second, as the Court explained above, the ALJ properly conducted the Craig credibility analysis and cited medical evidence in the record to support his findings.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ's decision to deny Claimant Social Security benefits was supported by substantial evidence and was based on a properly posed hypothetical question.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is

---

[10] Doc. No. 16, P. 9.

made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED:  September 22, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE